Eugene Tim BENJAMIN, III, Plaintiff,

v.

UNITED STATES of America, Federal Bureau of Investigation and United States Department of Justice, Defendants.

No. 80 CV 210 (ERN).

United States District Court,
E.D. New York.

Dec. 6, 1982.

---

Pokorny, Schrenzel & Pokorny by Abraham Pokorny, Dennis Stukenbroeker, Brooklyn, N.Y., for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Ralph L. McMurry, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

NEAHER, District Judge.

Plaintiff, Eugene T. Benjamin, III, brought this action pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2680(h), alleging that defendants were responsible for his false arrest and imprisonment on bank robbery charges. The case was tried without a jury solely on the issue of liability. After hearing the testimony of the parties and examining their exhibits, the Court makes the following findings of fact and conclusions of law.

*The Facts*

On Friday, February 23, 1979, the American Federal Savings and Loan Association in Macon, Georgia, was robbed by two individuals of approximately $1,965.50. Pursuant to 18 U.S.C. § 2113, the local police called in the Federal Bureau of Investigation ("FBI"), and Special Agent Richard Bigler, an FBI agent of 15 years standing, was placed in charge of investigating the robbery.

One of the first steps in the investigation was the State-wide dissemination of bank surveillance photographs taken on the day of the robbery. Two police officers of the Valdosta, Georgia Police Department, Lieutenant Walker and Patrolman Hankins, saw these photographs and immediately identified one photograph as being Eugene T. Benjamin, a former resident of Valdosta. FBI Special Agent Jerry Sparks, who was stationed in Valdosta, interviewed both officers and confirmed their original identification. Both stated they had known Benjamin for most of his life and had numerous contacts with him on the street. Moreover, Lt. Walker told Agent Sparks that he had shown the photographs to Benjamin's former employer, who was then a prisoner at the Valdosta City Jail, and he had also

positively identified Benjamin from the photographs.

The next day, Agent Sparks relayed this information by phone to Agent Bigler. Both Agent Bigler and the Assistant United States Attorney in charge of the case agreed that a positive identification by two police officers of a suspect known to both for several years was sufficient probable cause to arrest, and together they drafted a complaint naming Benjamin as a defendant. This complaint, along with an arrest warrant, was presented to and signed by United States Magistrate John Hancock on February 28, 1979. According to standard FBI procedures, Agent Bigler entered the arrest warrant in the National Crime Information Computer ("NCIC"), an intelligence network that makes arrest warrants available to law enforcement officials nationwide.

Benjamin first became aware that the FBI was looking for him in connection with the Macon, Georgia bank robbery during a phone call to his grandmother in Valdosta on March 22, 1979. Convinced that he could prove he was in his apartment in Brooklyn, New York on the day of the robbery, Benjamin immediately telephoned the Brooklyn-Queens FBI office in order to clear up the mistake. The Brooklyn-Queens office, however, could not confirm the existence of a Georgia warrant for Benjamin's arrest without making a computer check, so Benjamin was asked to call the bank robbery division the next morning.

After Benjamin's phone call, an NCIC inquiry was made which indicated that a federal warrant for a "Eugene Benjamin" was outstanding. The computer information was subsequently confirmed by a phone call to the Macon, Georgia FBI office. When Benjamin called the next day, March 23, 1979, he was informed of the existence of the warrant and was told to turn himself in. Benjamin gathered together the various documents he believed would show his whereabouts on February 22, 1979 and proceeded to the FBI office in Queens.

On his arrival at the FBI office, and despite his protestations of innocence, Benjamin was immediately placed under arrest for bank robbery by Special Agent Richard Robley. During the post-arrest interview, Agent Robley examined the numerous "scrambled" documents presented by Benjamin, but was unpersuaded that any of these papers could establish a conclusive alibi. Although the testimony differs on this point, Agent Robley's notes indicate that Benjamin did not provide the names of any individuals who would confirm his presence in Brooklyn on February 22, 1979.

Approximately four hours after his arrest, Benjamin was arraigned on bank robbery charges before United States Magistrate A. Simon Chrein in the Eastern District of New York. The Magistrate appointed legal counsel for Benjamin, and after a brief conference with this attorney, Benjamin pleaded not guilty. On advice of counsel, Benjamin waived his right to an extradition hearing and consented to the issuance of a warrant for his removal to the Middle District of Georgia. The Magistrate then set bail at $2,500 and ordered Benjamin extradited or released by April 2, 1979.

Unable to post bail, Benjamin was incarcerated in the Metropolitan Correctional Center in Manhattan until Friday, March 30, 1979, when he was transported by United States Marshals to the Bibbs County Jail in Macon, Georgia. No field investigation into Benjamin's claims of innocence was conducted until Monday, April 2, 1979, when Agent Bigler, after interviewing Benjamin for the first time, learned that several individuals could possibly corroborate Benjamin's presence in Brooklyn on the day of the robbery. Although Agent Robley began investigating these leads the evening of April 2, 1979, none of the alibi witnesses substantiated Benjamin's contentions.

The case against Benjamin suddenly crumbled on April 6, 1979. On that day, photographs taken of Benjamin at the time of his arrest were shown to bank employees with uniformly negative results. That afternoon Police Officers Hankins and Walker informed Agent Bigler that they no longer felt positive about their previous identification and did not want "to get involved in any identification of the bank photographs

as being that of [Benjamin]." Defendant's Exhibit U. Faced with this sudden change in position, Assistant United States Attorney Boyd decided that the case lacked supportive evidence and requested Magistrate Hancock to dismiss the complaint. Thus after 14 days in jail, Benjamin was released and the bank robbery charges were dropped.

*The Law*

In 1974, the Federal Torts Claims Act (FTCA) was amended to allow claims of false arrest or imprisonment resulting from the wrongful acts or omissions of "investigative or law enforcement officers of the United States Government" to be brought in federal district court. 28 U.S.C. § 2680(h). As in all cases under the FTCA, the government's liability for the conduct of its agents is determined "in accordance with the law of the place where the act or omission occurred." *Id.* § 1386(b), *construed in Hess v. United States,* 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960). Since the arrest and initial incarceration took place in Brooklyn, the tort law of the State of New York controls in this case.

■ The elements of false imprisonment under New York law are: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.' " *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975), *cert. denied sub nom. Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975), *quoted in Parvi v. City of Kingston,* 41 N.Y.2d 553, 556, 394 N.Y.S.2d 161, 163, 362 N.E.2d 960 (1977); *Kajtazi v. Kajtazi,* 488 F.Supp. 15, 18 (E.D.N.Y.1978). The same elements are required to state a claim for false arrest, *Jackson v. Police Dep't,* 86 A.D.2d 860, 447 N.Y.S.2d 320, 321 (2d Dep't 1982); *Karen v. State,* 111 Misc.2d 396, 444 N.Y.S.2d 381, 382 (Ct.Cl.1981), however, it can be assumed

that the first three elements are present whenever confinement results from a law enforcement official's assertion of his power to arrest. *Parvi v. City of Kingston,* 41 N.Y.2d at 557, 394 N.Y.S.2d at 163, 362 N.E.2d at 962. Consequently, the only issue in cases of wrongful arrest is the legal justification for the arrest.

■ The scope of the common-law privilege to arrest is by necessity a compromise between an innocent individual's right to be free from official harassment and society's need to apprehend the guilty. Under New York law, the legal demarcations of the privilege are well defined: the arrest and subsequent detention of an innocent individual carry no tort liability provided probable cause existed to believe that the individual had committed the crime in question. *E.g., Feinberg v. Saks & Co.,* 83 A.D.2d 952, 443 N.Y.S.2d 26, 27 (2d Dep't 1981); *Lawrence v. Police Dep't,* 81 A.D.2d 1006, 440 N.Y.S.2d 105, 106 (4th Dep't 1981), *aff'd,* 55 N.Y.2d 737, 447 N.Y.S.2d 154, 431 N.E.2d 639 (1982). When the arrest is pursuant to a facially valid warrant issued by a court with competent jurisdiction, probable cause is conclusively presumed. *E.g., Phillips v. City of Syracuse,* 84 A.D.2d 957, 446 N.Y. S.2d 725, 726 (4th Dep't 1982); *Saunsen v. State of New York,* 81 A.D.2d 252, 440 N.Y.S.2d 281, 282–83 (2d Dep't 1981); *Boose v. City of Rochester,* 71 A.D.2d 59, 421 N.Y.S.2d 740, 746 (3d Dep't 1979).[1]

■ Applying these principles to the case at bar, it is clear that plaintiff's arrest was lawful. The arrest was made pursuant to an arrest warrant issued by a United States Magistrate with subject matter jurisdiction over the offense charged. This judicial process was facially valid and the arresting officer correctly identified Benjamin as the individual named in the warrant.

The plaintiff argues, however, that the arrest warrant was invalid because it was procured with a complaint containing an intentional misstatement of fact, and conse-

---

1. The appropriate form of action for an erroneous arrest accomplished by a facially valid warrant is an action for malicious prosecution. *E.g., Broughton v. State of New York,* 37 N.Y.2d at 456, 373 N.Y.S.2d at 93, 335 N.E.2d at 313; *Boose v. City of Rochester,* 421 N.Y. S.2d at 746.

quently the agents acting pursuant to its authority became trespassers *ab initio.* As Agent Bigler admitted at trial, the complaint incorrectly stated that Lt. Walker and Patrolman Hankins personally informed Bigler of their photograph identification, when in fact that information had been relayed to Bigler from Agent Sparks.

While it is of course true that the police cannot insulate themselves from liability for false arrest by obtaining a warrant with perjurious affidavits, only intentional fabrication of facts material to the probable cause determination will generate tort liability. *Rosario v. Amalgamated Ladies Garment Cutters' Union,* 605 F.2d 1228, 1248 (2d Cir.1979); *Boose v. City of Rochester,* 421 N.Y.S.2d at 747; *Ross v. Village of Wappingers Falls,* 62 A.D.2d 892, 406 N.Y. S.2d 506, 509–10 (2d Dep't 1978). Since probable cause is evaluated in light of the collective knowledge of the law enforcement agency rather than the personal knowledge of a particular agent, *e.g., United States v. Rosario,* 543 F.2d 6, 8 (2d Cir.1976); *United States v. Thevis,* 469 F.Supp. 490, 503 (D.Conn.), *aff'd,* 614 F.2d 1293 (2d Cir.1979), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980), Agent Bigler's statement attributing Agent Sparks' personal knowledge to himself, while technically incorrect, was legally irrelevant. All the operative facts relevant to the probable cause evaluation were truthfully disclosed in the complaint; consequently, the validity of the warrant must be upheld.

Plaintiff also questions the authority of the Brooklyn-Queens FBI to execute an arrest warrant which was physically located in Georgia. The simple answer to this contention is that a federal warrant provides authority to arrest regardless of its geographic location. F.R.Crim.P. 4(d)(3); *id.* advisory committee note; *see United States v. Turcotte,* 558 F.2d 893, 895 (10th Cir. 1977). While the arresting officer in such a situation must exercise reasonable care and diligence in ascertaining both that a warrant indeed exists and that this individual is the suspect named in the process, *Francois v. United States,* 528 F.Supp. 533, 535 (E.D. N.Y.1981); *Winfield v. United States,* 430 F.Supp. 912, 914 (E.D.N.Y.1977); if the correct person is arrested, as in this case, no liability for false arrest exists. *Boose v. City of Rochester,* 421 N.Y.S.2d at 747. The only remedy available in such a situation is to challenge the original institution of charges in a malicious prosecution action, *Broughton v. State of New York, supra,* a course not chosen by the plaintiff in this action.

Finally, plaintiff contends that because he voluntarily brought the arrest warrant to the attention of the FBI, he should have been afforded the opportunity to establish his innocence before being subjected to arrest. Admittedly, this argument has superficial appeal: everyone should have the opportunity to convince the authorities of his innocence. However, a rule mandating a policy inquiry into the merits of an arrest warrant before execution would grossly misconstrue the arresting officer's role in the criminal investigatory process. Under the Federal Rules of Criminal Procedure, once probable cause has been established by a judicial officer, and an arrest warrant issued, "the warrant *shall* be executed by the arrest of the defendant." Rule 4(d)(3). At that stage in the investigation, the warrant compels arrest and, unless it is retracted by the court, the arresting officer who chooses to ignore its command operates at some personal risk. *See* 18 U.S.C. § 755.

Of course after arrest, the police cannot ignore exculpatory information provided by the suspect. As Justice Rehnquist has indicated, even "detention pursuant to a valid warrant but in the face of repeated protests of innocence [may] after a certain amount of time deprive the accused of 'liberty without due process of law.'" *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979). Similarly, New York courts have indicated that continued detention after facts sufficient to exonerate the accused have been provided, while not constituting false imprisonment, could give rise to an action for malicious prosecution. *Feinberg v. Saks & Co.,* 443 N.Y.S.2d at 27;

*Oakley v. City of Rochester,* 71 A.D.2d 15, 421 N.Y.S.2d 472, 474 (4th Dep't 1979), *aff'd,* 51 N.Y.2d 908, 434 N.Y.S.2d 977, 415 N.E.2d 966 (1980). No action for false arrest arises, however, when the police, executing a warrant, do not investigate the suspect's claims to innocence until after the arrest process has been completed. *See O'Neil v. Morgan,* 637 F.2d 846, 848 n. 2 (2d Cir.1980) (same rule applied in a warrantless arrest supported by probable cause).

In conclusion, the Court finds the evidence produced by plaintiff at trial insufficient to sustain his claims for relief. Accordingly, defendants are entitled to judgment dismissing the complaint.

SO ORDERED.